# EXHIBIT B

<u>Counterclaim Complaint</u>

(Attached)



COPY

Angelo A. Stio III (#014791997)
Stephanie L. Jonaitis (#015142002)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
(609) 452-0808
*Attorneys for MicroBilt Corporation*

**FILED**

**OCT 05 2022**

SUPERIOR COURT OF NJ
MERCER VICINAGE
CHANCERY

Bruce S. Luckman, Esq.
**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**
308 Harper Dr, #200
Moorestown, New Jersey 08057
(856) 663-1503
*Attorneys for Princeton Alternative Funding, LLC and*
*Princeton Alternative Funding, LLC*
*f/k/a MicroBilt Capital Funding, LLC*

| | |
|---|---|
| ROBERT FARRELL and ROBERT SZOSTAK, individually, and derivatively on behalf of PRINCETON ALTERNATIVE FUNDING, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> MICROBILT FINANCIAL SERVICES CORP., MICROBILT CORPORATION, PHILIP N. BURGESS, Jr., WALTER WOJCIECHOWSKI, ALONZO J. PRIMUS, PRINCETON ALTERNATIVE FUNDING, LLC, PRINCETON ALTERNATIVE FUNDING, LLC F/K/A MICROBILT CAPITAL FUNDING, LLC, and JOHN DOES 1, 2 and 3, <br><br> Defendants, <br><br> and, <br><br> PRINCETON ALTERNATIVE FUNDING, LLC, a Delaware limited liability company <br><br> Nominal Defendant, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIV. – MERCER COUNTY <br><br> DOCKET NO.: MER-C-6-16 <br><br> *Civil Action* |

1

3148951.1

## DEFENDANTS' SECOND AMENDED COUNTERCLAIMS

Defendant/Counterclaimant Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, and Defendant/Counterclaimant MicroBilt Corporation, by way of second amended counterclaim against Plaintiffs/Counterclaim Defendants, Robert Farrell and Robert Szostak, state as follows:

### The Parties

1.      Defendant/Counterclaim Plaintiff, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC ("Successor PAF"), is a Delaware limited liability company, and successor-in-interest to Princeton Alternative Funding, LLC ("PAF"), a Delaware limited liability company formed on August 29, 2014.

2.      Defendant/Counterclaim Plaintiff, MicroBilt Corporation ("MicroBilt"), is a Delaware corporation with a principal place of business located at 100 Canal Point Blvd., Princeton, New Jersey 08540.

3.      Plaintiff/Counterclaim Defendant, Robert Farrell ("Farrell") is an individual residing at 10 Darvel Drive, West Windsor, NJ, and a former Managing Member of PAF, and a current equity holder in Successor PAF.  Immediately prior to joining PAF, Farrell owned and operated cash for gold stores that operated out of strip malls.

4.      Farrell's employment history also reveals that he was a partner for an entity known as Cornell Capital Partners.  Farrell left Cornell Capital Partners to form Sagamore Holdings, Inc. and then utilized Sagamore Holdings to acquire another entity, Nexus Custom Electronics, Inc., with money that was borrowed from Cornell Capital Partners.

3148951.1

5.      Sagamore Holdings, under Farrell's leadership, was a failure.  It defaulted on its repayment obligations to Cornell Capital, which resulted in Cornell Capital seizing all of Nexus's assets.

6.      Cornell Capital, which Farrell helped run, changed its name to Yorkville Advisors, and following Farrell's departure was subject to a $1 billion claim by the SEC for fraud for overvaluing assets and $99 million tax bill for failing to pay taxes on its U.S. based income.

7.      While Farrell's Amended Complaint tries to portray him as an experienced financial service industry professional, his employment history reveals a pattern of leaving entities he managed in ruins.

8.      Plaintiff/Counterclaim Defendant, Robert Szostak ("Szostak") is an individual residing at 31303 Palm Court, Lawrenceville, New Jersey, and a former Managing Member of PAF, and a current equity holder in Successor PAF.

9.      In the ten years leading up to joining PAF, Szostak held eight different jobs with different employers.  In addition, Szostak's employment history reveals that he was terminated from his position at Dean Witter Reynolds, Inc. for "compliance violations."

10.      While the Amended Complaint tries to portray Szostak as an experienced finance industry professional who identified and developed investors, his employment history reveals an individual that had trouble holding a job and had little regard for compliance.

11.      Had Farrell or Szostak disclosed their backgrounds to the other members and equity holders, they would have never been asked to be a part of PAF.

## Background Facts

A.     **Farrell and Szostak are misusing trade secrets and breaching confidentiality obligations under Nondisclosure Agreements.**

12.     On January 25, 2016, Farrell and Szostak instituted this action against PAF and the other Defendants in both their individual capacity and derivatively on behalf of PAF.

13.     The Complaint and its attachments improperly identified PAF's investors and the amount of their investments, PAF's customers and the amounts of their loans, and revealed the terms of PAF's confidential agreement with defendant, MicroBilt Corporation.

14.     During their tenures, Farrell and Szostak each executed a Nondisclosure Agreement with MicroBilt.

15.     The Nondisclosure Agreement stated, in relevant part, that PAF and PAF's representatives, which are defined to include all of PAF's directors, officers, employees, agents, advisors and representatives (collectively the "PAF Representatives"), would hold "in confidence and will not, without written consent of [MicroBilt], be disclosed, in whole or part by [PAF] or any of [the PAF Representatives] and no Confidential Information shall be used by [PAF] or any of [the PAF Representatives] for any purpose whatsoever, except in connection with the Transaction."

16.     The Nondisclosure Agreement goes on to define Confidential Information to include "all business, financial, sales, officer, director, employee, consultant, vendor, customer, consumer and payment information belonging to [MicroBilt]."

17.     Further, the Nondisclosure Agreement recognizes that PAF could not disclose Confidential Information to any of the PAF Representatives "unless such Representatives agree to be bound by the terms of the Nondisclosure Agreement."

4

3148951.1

18.     Farrell and Szostak as "Managing Director[s]" each agreed to be bound to the Nondisclosure Agreement by executing their versions on September 1, 2014.   True and accurate copies of the Nondisclosure Agreements signed by Farrell and Szostak are attached as Exhibit A and Exhibit B.  In actually, Farrell and Szostak were Managing Members of PAF.

19.     On February 17, 2016, Defendants filed a Limited Motion to Seal Confidential Commercial and Financial Information by Redacting Initial Filings ("Motion to Seal") in order to seal the confidential information disclosed by Farrell and Szostak in the Complaint and to prevent Farrell and Szostak from making further disclosures of PAF's confidential information to third parties.

20.     Defendants filed the Motion to Seal to, among other things, maintain the confidentiality of the identity of its customers to prevent competitors from soliciting those customers.

21.     After conducting oral argument on March 18, 2016, the Court entered an Order on April 15, 2016 granting Defendants' motion for confidentiality and future redaction of among other things, PAF's investors and the amounts of their investments, PAF's agreement with MicroBilt, the identity of five of PAF's customers and their loan amounts.

22.     Sometime over the last few months, Farrell and Szostak joined an entity known as Keycap Business Funding LLC ("Keycap").

23.     Farrell and Szostak each joined Keycap in the capacity of Managing Partner.

24.     According to Keycap's website, it connects "businesses that seek capital with traditional and alternative lenders."

25.     Keycap's provision of services to businesses seeking alternative lenders puts it in competition with Survivor PAF, who also serves businesses in the alternative lending market.

26.     In or around December 2016, counsel for PAF learned that Farrell and Szostak had been in direct contact with at least three of PAF's customers.

27.     PAF also learned that Szostak would go on the company's Constant Contact lead provider database (a subscription service) and download contacts that he would then transfer to his own personal computer.

28.     By way of example, in October 2015, when he and Farrell were conspiring to start a new fund, Szostak numerous customer leads, customers and prospects of both MicroBilt and PAF.  Below is a spreadsheet from Constant Contact showing the exporting of information by Szostak.

| Recent Imports, Exports, and Other Actions | | |
|---|---|---|
| Date | Activity Type | Details |
| Completed | | |
| Oct 25, 2015 4:02pm EDT | Export Opens Report | Download CSV \| Download Excel 840 Contacts |
| Oct 25, 2015 3:59pm EDT | Export Clicks Report | Download CSV \| Download Excel 83 Contacts |
| Oct 25, 2015 3:56pm EDT | Export Opens Report | Download CSV \| Download Excel 394 Contacts |
| Oct 25, 2015 3:52pm EDT | Export Opens Report | Download CSV \| Download Excel 1322 Contacts |
| Oct 25, 2015 3:45pm EDT | Export Opens Report | Download CSV \| Download Excel 2199 Contacts |
| Oct 22, 2015 10:34pm EDT | Export Clicks Report | Download CSV \| Download Excel 76 Contacts |

29.     Upon information and belief, Farrell and Szostak contacted PAF's and MicroBilt's customers, prospects and leads in order to solicit business.

6

30.     Farrell and Szostak also contacted these customers and disclosed confidential information for the sole purpose of damaging the reputation of MicroBilt and Successor PAF and their good will in the marketplace.

31.     PAF further discovered that Szostak has been in repeated contact with his personal friend and a reporter from Hedge Fund Alert in order to solicit him to write negative stories about PAF, including inaccurate stories about his and Farrell's terminations and inaccurate stories about this lawsuit.

32.     The April 15, 2016 Order prevented the solicitation of PAF's customers by third parties by requiring Farrell and Szostak keep certain PAF customer identities confidential.

33.     The Nondisclosure Agreements that Farrell and Szostak executed prevented Farrell and Szostak from using any Confidential Information_that was provided by MicroBilt or its affiliates and subsidiaries.

34.     The Nondisclosure Agreements that Farrell and Szostak executed also required Farrell and Szostak to return or destroy within 10 days the Confidential Information upon request by MicroBilt, which occurred on January 4, 2015.

35.     Farrell and Szostak have abused the discovery process in this lawsuit and their former positions as Managing Members of PAF to divert confidential information from PAF and MicroBilt and are using it to damage Successor PAF.

36.     Farrell and Szostak have breached the confidentiality obligations in the Nondisclosure Agreement, by misusing Confidential Information in their new endeavors and failing to return or destroy it.

3148951.1

37.     Successor PAF now files counterclaims to prevent Farrell's and Szostak's further direct solicitation of PAF's customers through the use of misappropriated trade secret information, to prevent Farrell and Szostak from damaging Successor PAF in the marketplace and to recover damages that have resulted from their wrongful conduct.

38.     MicroBilt now files counterclaims to enforce the terms of the Nondisclosure Agreements as to Farrell and Szostak and prevent the misuse of Confidential Information.

**B.      Farrell's and Szostak's breach of duties of care and loyalty**

39.     Farrell was a co-founder, Managing Member and President of PAF from August 29, 2014 through January 4, 2015, when he was terminated.

40.     Farrell was supposed to be responsible for PAF' s day-to-day operations, participation in due diligence (initial approval and ongoing credit line advances), credit line and document compliance responsibilities for PAF's loan origination customers and was responsible for obtaining and reviewing loan origination customers' financial information and statements each month.

41.     Farrell was also supposed to be responsible to ensure that PAF was advancing funds to loan originators that were being used to fund consumer loans and further responsible for ensuring that PAF obtained valid collateral for all funds advanced.

42.     The original agreement was that neither Farrell nor any of the equity holders in the company would receive a salary or profit distributions.  Farrell was provided with equity that would increase in value through his hard work, and once PAF was profitable and remained profitable, Farrell would receive a $5,000 per month salary that would increase by $1,000 up to a maximum of $10,000 per month.

3148951.1

43.    Szostak had the same arrangement.

44.    Despite the agreement that none of the equity holders would receive a salary or profit distribution until PAF was profitable, in August 2015, Farrell and Szostak demanded that they begin receiving a monthly salary, even though PAF was not profitable.

45.    PAF ultimately agreed to Farrell's and Szostak's demands and paid them $5,000 each in August 2015.

46.    In spite of PAF agreeing to Farrell's and Szostak's demands, in September 2015, Farrell began to threaten to leave PAF, take customers, vendors and employees and start a competing fund.

47.    In a meeting Farrell threatened MicroBilt's, Walt Wojciechowski and Phil Burgess, with burning PAF to the ground if other equity holders in PAF did not like his management or the performance of his responsibilities.

48.    Farrell ultimately received a payments of $5,000 per month from PAF for August 2015, and this amount increased by $1,000 for each month through November 2015. Szostak received the same amounts.

49.    During his tenure at PAF, Farrell's actions were consistent with his threats to burn PAF to the ground and start a new fund.

50.    Unbeknownst to the other managing members and equity holders in PAF, Farrell engaged in serious misconduct and gross negligence that impacted the work of others that were providing marketing, compliance, treasury and legal services to PAF.

51.    Farrell's actions were for the sole purpose of damaging PAF and exposing it to significant liability.

3148951.1

52.    By way of example, during his tenure Farrell either intentionally or through gross negligence ignored marketing materials, compliance, and record keeping.

53.    Farrell also would not follow company procedures governing treasury and wiring of funds to loan originators.

54.    Farrell who was responsible for wiring advances to borrowers, would routinely, either intentionally or as a result of gross negligence, wire the wrong amounts to borrowers.

55.    Farrell would attempt to process wire transactions immediately without required approval, without regard to established procedure or appropriate documentation being in place and without verification that the amounts that were being wired were accurate.  This resulted in duplicate transactions, missed transactions, and incorrect amounts being wired to borrowers.

56.    Other employees and consultants for PAF would direct Farrell to follow company procedures and the verification process that was in place, but Farrell failed and refused to do so in order to damage PAF.

57.    The little documentation that Farrell did keep for the business he conducted also was inaccurate, or worse yet, missing information or simply unintelligible.

58.    Farrell would often scribble information on the back of other documents as his memorialization of transactions he processed or approved.  PAF's first-year audit was more difficult, and time consuming and costly, because Farrell's record keeping was poor or non-existent.  It also made it stressful for members of the accounting department to work with Farrell.

59.    PAF also discovered that Farrell would routinely ignore his responsibility to properly manage credit lines and document compliance for PAF loan originators and he altogether failed to obtain and review loan origination customers' financial information and statements on a monthly basis to ensure (a) advances that PAF made were to be used to fund consumer loans, (b) the consumer loans being made by loan originators complied with PAF's definition of eligible receivables, and (c) the consumer loans would serve as valid collateral for the money PAF advanced.

60.    Farrell's mismanagement was not limited to document management and compliance.  Farrell gave little concern for accounting records that were provided to him.

61.    Farrell would ignore his responsibility to review month end accounting records and would approve interest schedules for borrowers that had the wrong information.

62.    In fact, when FundAdmin would send reporting over to Farrell for approval to be released to PAF's investors, Farrell would rubber stamp the documents without any review and then joke about how he had no idea what they even said.

63.    Farrell's grossly negligent and intentional acts of refusing to fulfill compliance, accounting, treasury, and documentation responsibilities, created a platform for unscrupulous borrowers to commit theft and fraud under his watch.

64.    As President of PAF and the senior individual responsible for ensuring advances that PAF made were used for consumer loans and these loans complied with PAF's definition of eligible receivables, Farrell was able to hide his egregious acts from PAF's other managing members and equity holders.

3148951.1

65.     As President of PAF and the senior individual responsible for oversight, analysis and review of the financial information provided from loan originators, Farrell was able to hide his egregious acts from PAF's other managing members and equity holders.

66.     While Farrell and Szostak try to excuse their poor performance by raising allegations in the Second Amended Complaint that MicroBilt never provided them with a functioning dashboard, the fact of the matter is that Farrell and Szostak had little understanding of what a dashboard was and how it was to be used.

67.     In fact, Farrell was provided with a working dashboard, which he described in an email as "really looking sharp."

68.     Farrell and Szostak, however, were unable to utilize the dashboard or, for that matter, fulfill their responsibilities because they could not grasp the simplest of concepts.

69.     Employees commented that Farrell and Szostak had a hard time logging into their computers, operating email and MicroSoft programs.

**C.     Farrell's and Szostak's fraud on PAF**

70.     Farrell and Szostak also conspired with PAF's investors, Ranger Specialty Income Fund, L.P. and Ranger Direct Lending Fund Trust (a public Trust listed on the London Stock Exchange) (collectively "Ranger") to create spreadsheets that were knowingly false and represented to PAF members and officers, that PAF had not extended credit facilities to any single loan originator in excess of $4 million.

12

71.     The spreadsheets that Farrell and Szostak created and circulated with Ranger's assistance, represented that all loans originated by Argon Credit were held in numerous individual subsidiaries (or single purpose entities) in various states throughout the United States.

72.     Walt Wojciechowski discovered in early 2017 that the information on the spreadsheets was false as the loans were all held by Argon X, LLC and not the individual subsidiaries established by Argon Credit to originate the loans.

73.     Farrell and Szostak, with the assistance of Ranger, created the spreadsheets on a monthly basis showing the loans being held by the Argon Credit subsidiaries and not Argon X.  To make matters worse, Farrell and Szostak provided these spreadsheets to Ranger and to PAF and PAF's officers to demonstrate the entities that owned the loans and to show that Ranger was compliant with its own fund documents.

74.     Farrell and Szostak also used the fraudulent spreadsheets to induce PAF to fund loans originated by the Argon Credit subsidiaries, in amounts that were far in excess of the amounts Argon Credit should have reasonably been able to borrow.

75.     Farrell and Szostak never advised the other members of PAF or PAF's officers of their actions and the creation of knowingly false spreadsheets that were relied on to fund loans.

76.     Argon Credit ultimately filed for bankruptcy in December 2016.

77.     Upon information and belief, following the Argon Credit bankruptcy filing, Farrell and Szostak contacted the SEC and made knowingly false statements about PAF and PAF's operations which were designed to harm PAF, its officers and its employees *and* to

3148951.1

conceal Defendants' fraudulent and wrongful action in connection with the Argon Credit loans and oversight of such loans.

78.     The lies and false statements made to the SEC, in or about March to May 2017, were to the effect that:

a.     PAF did not have access to resources, such as loan and consumer loan performance and monitoring;

b.     MicroBilt failed to and never identified preferred lenders to which PAF would lend money;

c.     Statements to investors regarding the foregoing resources were false; and

d.     Mr. Burgess's role was intentionally and wrongfully concealed from investors, when Defendants each knew legal advice regarding whether and how to disclose Mr. Burgess's involvement and consultation services had been obtained.

79.     As a direct result of the foregoing false communications, the SEC commenced and investigation in early spring 2017 and ultimately filed a civil complaint in June 2021.

80.     As part of the ongoing vendetta and fraudulent schemes, Szostak repeatedly sent threatening and harassing texts to various PAF employees and former employees repeating the foregoing lies. The texts threatened criminal actions, an Armageddon of civil litigation and loss of careers.

81.     As a result of Farrell's and Szostak's actions in creating knowingly false spreadsheets, circulating them to PAF and PAF's officers and telling lies to the SEC in a whistle-blower action, PAF has been damaged by approximately $30,000,000.

3148951.1

**D.      Farrell and Szostak's other wrongful conduct**

82.      Farrell's wrongful conduct came in full focus in October 2015 when he and Szostak began plans to start a new hedge fund to compete against PAF.

83.      During this time around October 28 and October 29, 2015, despite their positions as Managing Members, Farrell and Szostak approached Pat Nanda, who was in charge of analytics for PAF, to see if Nanda would be interested in leaving PAF and performing analytics for them in a new hedge fund.

84.      It was at this same time that Szostak was downloading client and prospect lists and emailing them to his home.

85.      Szostak's conduct in fulfillment of his job responsibilities was equally as egregious as Farrell's conduct.

86.      Szostak would regularly change marketing materials and investor documents without any marketing review, or legal or compliance oversight.  To make matters worse, he would utilize his daughter, a college student, to prepare investor decks and marketing materials and would alter the company's website despite the fact that PAF had marketing and compliance professionals responsible for these activities.

87.      Marketing documents and investor materials became a constant source of contention at PAF under Farrell and Szostak's tenure.

88.      Szostak would spend hours changing already written and agreed upon content for materials, then would distribute his new versions which were filled with errors.

89.      When errors were pointed out and corrected, Szostak would become loud, defensive and abusive and prepare a revised interpretation, filled with more errors, resulting in a repeat of the unproductive cycle he initiated.

3148951.1

90.    Szostak also would abuse his position by using trade shows he attended on behalf of PAF as an excuse to take his wife on vacation with him.

91.    While these trade shows were an opportunity to generate leads for Princeton Alternative Income Fund, L.P., Szostak would utilize them and PAF's booth to promote his wife's business of selling corporate marketing give-aways.

92.    Szostak, who was supposed to be responsible for generating investors for the fund, refused make phone calls to prospect for investors. Instead, he would simply send a LinkedIn invitation with the hope of generating a response.

93.    No response ever came.

94.    Faced with the inability to generate investor interest, Szostak turned to trying to take credit for the work of others.

95.    Farrell was complicit in these actions as he directed PAF's marketing personnel to change contact information for all marketing materials so that all prospective investors and customers leads went to Bert Szostak -- with whom Farrell was scheming with to start a competing fund.

96.    While Szostak purports to take responsibility in the Second Amended Complaint for obtaining the largest investor in Princeton Alternative Income Fund, L.P., that investment was initiated by Robert Wade.

97.    After the investor was brought in by Wade, Farrell and Szostak subsequently attempted to deprive Wade of commissions for the investment he initiated by altering Wade's commission agreement and trying to give Szostak credit for the commission.

98.    Wade, who would make up to forty calls per day to develop relationships with potential investor prospects, was instructed by Farrell to cease any further contact with the

relationships he developed for a period of approximately 3-6 months so Szostak could have the ability to develop relations with these investors.

99.     To make matters worse, both Farrell and Szostak instructed Wade not to call or waste his time calling certain classes of potential clients in order to sabotage PAF.

100.    Szostak also spent significant time travelling the country to speak at peer-to-peer and marketplace lending conferences.

101.    PAF, however, was not in the peer-to-peer or marketplace lending business, but in the alternative financing business.  This fundamental misunderstanding of PAF's business was indicative of Szostak's unsuccessful tenure at PAF.

102.    While at PAF, Szostak grew more and more paranoid about his performance and he had a habit of listening in on various internal and external conference calls between PAF and MicroBilt employees without identifying himself in order to gain access to confidential information.

103.    Szostak also would routinely fight with Farrell and other employees in the office.  Szostak would engage in shouting matches with Farrell that often became quite confrontational and verged on becoming physical.

104.    Moreover, when employees questioned actions taken by Szostak or Farrell, they would respond with profanity, threats and intimidation in an attempt to either get their way or cover up their wrongful conduct.

105.    Employees in the office stated that when Szostak and Farrell were employed, the office atmosphere was chaotic, hostile and intimidating.

106.    After they were terminated, MicroBilt's Executive Vice President of Marketing described working with Farrell and Szostak as an environment where yelling, cursing

3148951.1

at the top of your lungs and throwing temper tantrums through the office on a daily basis was considered normal.  He also stated that on multiple occasions he thought they were going to start a fight and he was ready to call the police.

107.    MicroBilt's Vice President and Controller, who worked for the organization for twenty-years, threatened to quit because of Farrell and Szostak's inability to grasp simple concepts, follow procedures or work with others.

108.    MicroBilt's Human Resources Director, whose cubicle was near Szostak, found it difficult to concentrate because of the way Szostak and Farrell interacted with each other and with other employees.  She said that she feared for her safety and received complaints from others who found it difficult to work in the environment Farrell and Szostak created.

109.    Employees also asked to have their desks moved away from Farrell and Szostak to get away from the environment.

110.    Things came to a head in December 2015, when Farrell and Szostak sent a letter to PAF threatening to quit and threatening to approach PAF's largest investor and get it involved in their dispute.

111.    In response, on January 4, 2016, Farrell and Szostak were terminated from their positions for cause.  Their termination letter states, in relevant part, that they were being terminated because they "put [their] own personal interests ahead of PAF's, and threaten to involve [PAF's largest investor]."

112.    The termination letter documented that their "work productivity for PAF has been grossly inadequate," they "failed to follow directions and reasonable guidance," their conduct was "contrary to the initial understanding of all [PAF's] Members, counterproductive, insubordinate, and in breach of their fiduciary duties."

113.    Finally the termination letter noted that Szostak and Farrell conducted themselves in an "unprofessional manner," and had made "threats to sue, leave and compete with PAF, go to a competitor for analytics, and solicite other personnel."

114.    After their terminations, PAF's other member MicroBilt was left to deal with mess and remedy the sabotage efforts of Farrell and Szostak.

115.    When PAF was formed, the model the members discussed was to have a fund consisting of multiple smaller investors.

116.    Farrell and Szostak were either incapable of attracting investors, or worse still, conspiring to attract investors for their own planned hedge fund, as opposed to the Princeton Alternative Income Fund, L.P.  Their gross negligence and intentional actions left PAF severely damaged.

117.    Farrell and Szostak had not raised investor funds to support operations and they failed to fulfill their responsibilities to insure borrowers were submitting proper documentation and that there was adequate collateral in place to secure amounts that PAIF advanced.

118.    As a proximate result of Farrell and Szostak's conduct, between January 2016 and the present, MicroBilt had to contribute in excess of $2.2 million to keep PAF operational and generating investor returns, and PAF has suffered millions of dollars in damages from borrowers' fraud.

119.    In short, Farrell, with Szostak's assistance, damaged MicroBilt and PAF through intentional acts and gross negligence.

3148951.1

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT AND
## PROSPECTIVE ECONOMIC ADVANTAGE
### (PAF v Farrell and Szostak)

120.    PAF repeats and re-alleges its foregoing allegations as if set forth at length herein.

121.    The identity of PAF's customers, PAF's business relationships with its customers, PAF's business plan and PAF's processes and procedures are confidential and constitute trade secrets of PAF (the "Confidential Information").

122.    Farrell and Szostak were provided with access to the Confidential Information in their capacities as Managing Members of, and equity holders in, PAF, and were contractually required to preserve the confidentiality of this information for PAF.

123.    During their employment with PAF, however, Farrell and Szostak failed to preserve the confidentiality of the Confidential Information.

124.    Among other things, Successor PAF discovered that Szostak emailed to his home email account Confidential Information, including customer and investor prospect lists and leads that were developed by PAF.

125.    Farrell and Szostak's misappropriation of the Confidential Information was occurring at the same time they were serving as Managing Members of PAF. It also was occurring at the same time Farrell was threatening other equity holders in PAF with "burn[ing] the house down" if PAF did not comply with his demands.

126.    Following their terminations, Farrell and Szostak joined an entity, Keycap, that competes or competed with PAF for investors and borrowers.

127.    Farrell and Szostak also started Princeton Lenders LLC and Crossbow Capital LLC, which purport to arrange for financing for businesses and consumers.

20

128.    Upon information and belief, Farrell and Szostak have been using and continue to use the Confidential Information, including customer and investor leads and lists, that they obtained as former Managing Members, employees and equity holders of PAF, in order to improperly solicit customers and investors away from PAF, for their own benefit.

129.    Farrell and Szostak are using PAF's Confidential Information to contact PAF leads, investors and customers and tortiously interfering with Successor PAF's contracts and/or prospective economic advantage with these entities..

130.    Farrell's and Szostak's purpose, direct or indirect, in misappropriating PAF's Confidential Information is to benefit themselves and injure PAF.

131.    Farrell's and Szostak's conduct has been willful and outrageous, and was undertaken with reckless indifference to PAF's rights.

132.    Farrell's and Szostak's actions to contact and solicit PAF's leads, investors and customers was intentional and without justification.

133.    As a result of Farrell's and Szostak's actions, Successor PAF has suffered and continues to suffer damages.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC respectfully requests that the Court enter judgment in its favor and against Robert Farrell and Robert Szostak, on Count I as follows:

A. granting PAF its actual and compensatory damages as applicable;

B. granting PAF incidental, consequential, and punitive damages as permitted by law;

C. granting PAF pre-judgment and post-judgment interest as applicable;

D. granting PAF its attorneys' fees and costs; and

3148951.1

E. granting PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT II
## BREACH OF DUTY OF LOYALTY
### (PAF/MicroBilt v Farrell and Szostak)

134.   PAF and MicroBilt repeat and re-allege the foregoing allegations as if set forth at length herein.

135.   As Managing Members of PAF, Farrell and Szostak had a duty of loyalty and care to act in good faith and in the best interest of PAF and the other members and to use the amount of care that a reasonably prudent person would exercise in similar circumstances in fulfilling their responsibilities.

136.   Farrell breached his duties of care and loyalty by being grossly negligent in fulfilling his responsibilities and by intentionally engaging in a campaign to burn PAF to the ground for failing and refusing to succumb to his demands and to spite other managing members and equity holders of PAF.

137.   As set forth above, Farrell failed to fulfill the most basic responsibilities of his position as President and Managing Member of PAF by failing to ensure cash advances that PAF made to originators were used to fund consumer loans and these loans, complied with PAF's definition of eligible receivables, and failing to confirm there was sufficient collateral to serve as security for the funds PAF advanced.

138.   Farrell's actions were reckless, indifferent to PAF's best interests, and were in deliberate disregard of the rights of PAF, MicroBilt and PAF's other equity holders who expected him to act in good faith and with loyalty to the company.

22

3148951.1

139.    As a result of Farrell's actions, PAF and MicroBilt have been and continue to suffer damages.

140.    Likewise, Szostak breached his duties of care and loyalty by engaging in grossly negligent conduct and failing and simply refusing to fulfill his responsibilities. Furthermore, as detailed above, Szostak engaged in intentional acts of misappropriating customer and prospect contacts for his own personal use, using company resources to promote his wife's business and fund her travel, and intentionally sabotaging the efforts of the fund to raise funds.

141.    Szostak's actions were reckless and indifferent to PAF's best interests, and were in deliberate disregard of the rights of PAF, MicroBilt and other equity holders who expected him to act in good faith and with loyalty to the company.

142.    As a result of Szostak's actions, PAF, MicroBilt and other equity holders has suffered and continues to suffer damages.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation request that the Court enter judgment in its favor and against Robert Farrell and/or Bert Szostak, on Count II of the Counterclaim, and award it the following:

A.    Awarding PAF compensatory damages in an amount to be proven at trial;

B.    Awarding PAF punitive damages;

C.    Awarding PAF equitable disgorgement of all compensation and equity interests in Successor PAF;

D.    Awarding PAF prejudgment interest, attorney's fees and costs of suit; and

E.    Awarding PAF such other relief as the Court deems equitable and just under the circumstances.

23

3148951.1

## COUNT III
## COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
### (PAF v Farrell and Szostak)

143.    PAF repeats and re-alleges its foregoing allegations as if set forth at length herein.

144.    Farrell and Szostak acquired access to and knowledge of Successor PAF's trade secrets, including the list of contacts, customer leads, and customers, in their roles as Managing Members, and equity holders in PAF (Successor PAF's predecessor).

145.    The information that Farrell and Szostak retained, used, and/or disclosed consists of, at a minimum, the confidential identity of certain PAF clients and prospective clients, the confidential identity of certain PAF funding sources, the specific financing terms and business arrangements PAF has with its clients, PAF's confidential analytic reports, and PAF's processes, procedures and confidential business plans.

146.    PAF expended substantial time, effort, and money to develop this confidential information concerning clients, funding sources, business arrangements, analytic reports and processes, procedures and confidential business plans.

147.    Successor PAF's confidential information is not available to the general public.

148.    Successor PAF takes reasonable measures under the circumstances to protect the confidentiality of its information, as described further above.

149.    Farrell and Szostak acquired PAF's trade secrets and confidential information in their capacities as Managing Members and equity holders in PAF and under circumstances giving rise to a duty to maintain their secrecy or limit their use.

3148951.1

150.     Any use or disclosure of this information, which was developed through PAF's investment of time, effort and expense, in its clients and business, outside of PAF, will be devastating.

151.     Because Farrell and Szostak now work for or are involved in Keycap, and/or Princeton Lenders and/or Crossbow Capital, which compete with PAF, this trade secret information is now in the hands of PAF's competitors.

152.     Upon information and belief, Farrell and Szostak have already been using this trade secret information to solicit PAF's customers, prospective customers, investors and prospective investors.

153.     Farrell's and Szostak's use of PAF's trade secret information is without PAF's express or implied consent.

154.     By virtue of Farrell's and Szostak's actions and threatened misappropriation of PAF's trade secrets, PAF has suffered, will suffer, and is threatened to suffer, immediate and irreparable harm.

155.     Farrell's and Szostak's actual and threatened misappropriation of trade secrets may be enjoined.

156.     Unless Farrell and Szostak are enjoined from soliciting PAF's customers, and enjoined from using or disclosing PAF's confidential and trade secret information, PAF will be irreparably harmed by:

     a.     an unquantifiable loss of sales and profits;

     b.     loss and diminution of customer relationships;

          c.  the immediate and direct accessibility of PAF's institutional knowledge, financing terms, business strategies, and other practices to its customers and Keycap;

3148951.1

    d.  loss and diminution of customer confidence, trust, and goodwill; and

    e.  loss of confidential, proprietary, and trade secret information.

157.   PAF has no adequate remedy at law.

158.   Farrell's and Szostak's conduct has been willful and outrageous, and was undertaken with reckless indifference to PAF's rights.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC respectfully requests that the Court enter judgment in its favor and against Robert Farrell and Robert Szostak, on all Count III of the Counterclaim, as follows:

    A.  permanently restraining Robert Farrell and Robert Szostak and each person acting in concert with them or on their behalf from soliciting, selling to, or servicing PAF's customers, on behalf of Keycap;

    B.  granting PAF its actual and compensatory damages as applicable;

    C.  granting PAF incidental, consequential, and punitive damages as permitted by law;

    D.  granting PAF pre-judgment and post-judgment interest as applicable;

    E.  granting PAF its attorneys' fees and costs, including pursuant to the New Jersey Uniform Trade Secrets Act; and

    F.  granting PAF such other relief as the Court deems equitable and just under the circumstances.

### COUNT IV
### BREACH OF NONDISCLOSURE AGREEMENT
### (MicroBilt v Farrell and Szostak)

159.   MicroBilt repeats and re-alleges its foregoing allegations as if set forth at length herein.

160.    The Nondisclosure Agreements attached as Exhibits A and B are valid and enforceable agreements that Farrell and Szostak signed and agreed to be bound as to PAF and as PAF Representatives.

161.    Farrell and Szostak breached the Nondisclosure Agreements by diverting Confidential Information belonging to MicroBilt and MicroBilt's subsidiaries and affiliates for use outside the venture contemplated in the Non-Disclosure Agreements.

162.    Farrell and Szostak also breached the Nondisclosure Agreements by failing and refusing to return or destroy the Confidential Information as requested in their January 4, 2015 termination letter.

163.    This Confidential Information included lists of contacts, customer leads, the identity of customers of MicroBilt, and the MicroBilt Services Agreement.

164.    MicroBilt's Confidential Information is not available to the general public.

165.    MicroBilt takes reasonable measures to protect the confidentiality of its information.

166.    Farrell and Szostak acquired MicroBilt's Confidential Information in their capacities as PAF Representatives and were obligated to maintain the secrecy of this information.

167.    Because Farrell and Szostak now work for, or are involved in Keycap, and/or Princeton Lenders and/or Crossbow Capital, utilizing MicroBilt's Confidential Information, MicroBilt's rights under the Nondisclosure Agreement are being denied.

168.    Upon information and belief, Farrell and Szostak have been using the Confidential Information to solicit customers, prospective customers, investors and prospective investors.

3148951.1

169.    Farrell's and Szostak's use of the Confidential Information is without the consent of MicroBilt.

170.    By virtue of Farrell's and Szostak's breach of the Nondisclosure Agreements, MicroBilt has suffered, will suffer, and is threatened to suffer, immediate and irreparable harm.

171.    Farrell's and Szostak's misuse of MicroBilt's Confidential Information should be enjoined.

172.    Farrell's and Szostak's conduct has been willful and outrageous, and was undertaken with reckless indifference to MicroBilt's rights.

**WHEREFORE**, MicroBilt Corporation respectfully requests that the Court enter judgment in its favor and against Robert Farrell and Robert Szostak, on Count IV of the Counterclaim, as follows:

A.    permanently restraining Robert Farrell and Robert Szostak and each person acting in concert with them or on their behalf from soliciting, selling to, or servicing customers, customer leads or prospects originating with PAF or MicroBilt;

B.    granting MicroBilt its actual and compensatory damages as applicable;

C.    granting MicroBilt incidental, consequential, and punitive damages as permitted by law;

D.    granting MicroBilt pre-judgment and post-judgment interest as applicable;

E.    granting MicroBilt its attorneys' fees and costs; and

F.    granting MicroBilt such other relief as the Court deems equitable and just under the circumstances.

**COUNT V**
**FRAUD**
**(PAF v Farrell and Szostak)**

3148951.1

173.    PAF repeats and re-alleges its foregoing allegations as if set forth at length herein.

174.    Farrell and Szostak also conspired with PAF's investors, Ranger, to create spreadsheets that were knowingly false and represented to PAF members and officers, that PAF had not extended credit facilities to any single loan originator in excess of $4 million.

175.    The spreadsheets that Farrell and Szostak created and circulated with Ranger's assistance, represented that all loans originated by Argon Credit were held in numerous individual subsidiaries (or single purpose entities) in various states throughout the United States.

176.    Walt Wojciechowski discovered in early 2017 that the information on the spreadsheets was false as the loans were all held by Argon X, LLC and not the individual subsidiaries established by Argon Credit to originate the loans.

177.    Farrell and Szostak, with Ranger's assistance, created the spreadsheets on a monthly basis showing the loans being held by the Argon Credit subsidiaries and not Argon X. To make matters worse, Farrell and Szostak provided these spreadsheets to Ranger and to PAF and PAF's officers to demonstrate the entities that owned the loans and to show that the investor was compliant with its own fund documents.

178.    Farrell and Szostak also used the fraudulent spreadsheets to induce PAF to fund loans originated by the Argon Credit subsidiaries, in amounts that were far in excess of the amounts Argon Credit should have reasonably been able to borrow.

179.    Farrell and Szostak never advised the other members of PAF or PAF's officers of their actions and the creation of knowingly false spreadsheets that were relied on to fund loans.

180.    Argon Credit ultimately filed for bankruptcy in December 2016.

181.    Upon information and belief, following the bankruptcy filing, Farrell and Szostak contacted the SEC and made knowingly false statements about PAF and PAF's operations.

182.    As a result of Farrell's and Szostak's actions in creating knowingly false spreadsheets, circulating them to PAF and PAF's officers and making false statements to a government entity, PAF has been damaged by approximately $30,000,000.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC respectfully requests that the Court enter judgment in its favor and against Robert Farrell and Robert Szostak, on Count V as follows:

A.    Awarding PAF compensatory damages in an amount to be proven at trial;

B.    Awarding PAF punitive damages;

C.    Awarding PAF prejudgment interest, attorney's fees and costs of suit; and

D.    Awarding PAF such other relief as the Court deems equitable and just under the circumstances.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:5-1(c), Angelo A. Stio III is designated as trial counsel in this matter for MicroBilt Corporation.   Bruce Luckman is designated as trial counsel in the matter for Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC.

3148951.1

## <u>CERTIFICATION PURSUANT TO RULE 4:5-1(B)(2)</u>

I hereby certify that to the best of my knowledge, this matter is not the subject of any other action pending in any Court or of any pending arbitration proceeding, and that no other action or arbitration is contemplated at this time.

<u>s/Bruce S. Luckman</u>
Bruce S. Luckman, Esq.
**SHERMAN, SILVERSTEIN, KOHL,**
**ROSE & PODOLSKY, P.A.**
308 Harper Dr, #200
Moorestown, New Jersey 08057
(856) 663-1503

*Attorneys for Defendant Princeton Alternative*
*Funding, LLC f/k/a MicroBilt Capital*
*Funding, LLC, as successor-in-interest to*
*Princeton Alternative Funding, LLC*

<u>s/Angelo A. Stio, III</u>
Angelo A. Stio III (#014791997)
Stephanie L. Jonaitis (#015142002)
**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP**
Suite 400
301 Carnegie Center
Princeton, NJ 08543-5276
(609) 452-0808

*Attorneys for MicroBilt Corporation*

Dated: October 4, 2022

31

3148951.1

## VERIFICATION

I, Walt Wojciechowski, of full age and duly sworn according to the laws of the State of New Jersey, hereby certifies and says:

1.     I am a _CFO_ of Princeton Alternative Funding, LLC, Plaintiff in the foregoing Second Amended Counterclaim and authorized to make this Verification on its behalf.

2.     I have read the foregoing Second Amended Counterclaim. The allegations contained therein are true to the best of my personal knowledge.

3.     I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: 10·03·2022

By: _Walter Wojciechowski, CFO_
Walt Wojciechowski

3149093.1